### THE KITTEGAUN.

### BANQUE-RUSSO ASIATIQUE LONDON v. UNITED STATES SHIPPING BOARD EMERGENCY FLEET CORPORATION.

(District Court, E. D. Pennsylvania. June 20, 1922.)

No. 24.

1. **Shipping ☞177—Demurrage for delay in discharging not recoverable, where vessel is authorized to discharge at consignee's risk.**

Demurrage for delay after vessel is ready to discharge is essentially a claim for damages for failure to accept delivery, and is not recoverable, where the vessel is authorized to discharge at consignee's risk.

2. **Shipping ☞177—Claim for demurrage disallowed.**

Demurrage for delay in discharging *held* not collectable where the delay was caused by an unjustifiable demand by the agent of the vessel, made on the first day the vessel was ready to discharge, and for prepayment of freight which was not payable until the output of the ore cargo was known.

In Admiralty. Suit by the Banque-Russo Asiatique London against the United States Shipping Board Emergency Fleet Corporation, as owner of steamship Kittegaun. Decree for libelant.

See, also, 266 Fed. 897.

Lewis, Adler & Laws, of Philadelphia, Pa., for libelant.
George W. Coles, U. S. Atty., of Philadelphia, Pa., for respondent.

DICKINSON, District Judge. The form of action is in personam. The cause of action is the implied assumpsit to return moneys exacted under duress and paid under protest, with notice of action to recover what was unlawfully exacted. The defense is the demand under which payment was made was a lawful demand.

### Statement of Facts.

The sum in dispute is $32,775, representing demurrage for detention of vessel from 5 p. m. on February 26 to 8 a. m. March 6, 1920, or 8 days and 15 hours, at the rate of $3,800 per day. This is on the basis of $1 per ton registered tonnage. The vessel was the steamship Kittegaun. She stopped at the port of Philadelphia on her way to New York. The Export Steamship Corporation was at the time the managing operator for the Shipping Board. Charles Kurz had, on February 24, 1920, been made agent for the vessel at Philadelphia. There was for a time some uncertainty of whether the vessel would make port first at Philadelphia or New York. The agent learned she was coming to Philadelphia just before she arrived. No arrangements

had then been made to dock her. She anchored off Pier 36 South at 5 p. m. February 26th, was entered in the Custom House at 11 a. m. on the 27th, and was docked at Point House Pier at 5 p. m. on the 28th. The agent did not see the ship's manifest until just before she was entered in the Custom House. The place of docking was selected by the agent of the vessel on his own initiative as a convenient and proper place to discharge the cargo. The 28th was Saturday. It was too late to rig tackle for unloading on that day, and none was rigged out.

On the vessel was a number of tons of peroxide of manganese ore. This was consigned to the libelant by Prince D. Jevahoff the consignor, the bill of lading being drawn to the ord· · of libelant. There was other cargo consigned to Philadelphia consignees. The agent made arrangements with the Pennsylvania Railroad Company for box cars into which to load the manganese. Had this arrangement been carried out the unloading would have begun on Tuesday morning, March 2d, at 10 a. m. The consignee, however, was unknown, and as the ultimate destination of the ore was also unknown, no shipping directions could be given the railroad company who in consequence refused to supply the cars. This was because of an embargo which forbade it. The failure to discharge in cars was reported to the vessel's manager, with a recommendation against unloading on lighters. Lighters finally came alongside the ship, and on March 6th at 8 a. m. the unloading began. The ore was all unloaded by 2:30 p. m. March 15th. The unloading of the general cargo began at 7 a. m. March 16th, and was completed at 10:35 a. m. March 17th. The general cargo might have been unloaded first. Part of it was consigned to the C. J. Webb Company. There was also part of the cargo destined for New York, which was discharged at Philadelphia.

### The Contract.

There are four pertinent features of the contract. One is that the consignee was to accept delivery from the ship's tackle; another is that the ship on failure of the consignee to take was given the fullest authority to dispose of the cargo at the consignee's expense and risk; the third is that the freight to be paid could not be determined until the cargo was discharged because it was payable on the basis of output; and the fourth is that, if no facilities were "available for discharging into a craft or on wharf without delay to steamer," the consignees were chargeable with demurrage at an unnamed sum "per net register ton per day." The custom of the port was to discharge for unknown consignees on lighters or otherwise.

### The Causes of Delay.

One cause undoubtedly was that the consignee was not present to accept delivery, and neither the consignee nor its address was known. The agent of the vessel made prompt and every reasonable effort to locate the consignee. The consignee was inquired for in shipping circles, and an advertisement sent to the Philadelphia Public Ledger and the Journal of Commerce in New York on Saturday, February 28th.

These advertisements could not have been published before March 1st. The consignee was certainly known before March 3d, and (although he may have been in error in this) according to the testimony of the agent of the vessel was known on March 1st, because he rendered a bill for freight on that day. Another cause of delay was a dispute over the demands of the vessel. This was not adjusted until March 5th. The cargo was then at once discharged.

## Discussion.

[1, 2] The demand for demurrage here for the detention of the vessel is over 75 per cent. of the freight for the carriage of the ore from Gibraltar. Demurrage is essentially a claim for damages for failure to accept delivery. The only question raised in the cause is the legal justice of the claim made and paid under compulsion and protest. If it was legally demandable, it is conceded it may be retained; if not legally demandable, it is admitted the libelant may recover it. The first fact to be found is the fact of detention by the consignee. There could have been no detention before March 2d, because of the finding which is now made that the ship was not ready to discharge before that date. The efforts which the agent of the vessel made to find a place of discharge were by anticipation, because by the time the vessel was ready the consignee had been found. The delay from March 2d to March 6th was due to the demand made by the vessel. The demand was for demurrage and for prepayment of freight. Neither demand can be sustained. There had been no demurrage incurred, and no freight was payable until the output of ore was known. In any event, it was the duty of the vessel to discharge. It could not refuse to discharge and claim demurrage for the delay thus caused. It had stipulated for the right to discharge at the risk of the consignee. It had this right independently of the stipulation. The objection which the vessel made to discharging on open lighters did not affect what was done, because before the time came when the vessel was prepared to discharge it was known the cargo could safely be so discharged. The reason for not discharging then became solely the unjustified demand of the vessel.

Our conclusion is that the libelant is entitled to recover, with costs, and a formal decree to that effect may be drawn. Formal fact finding and conclusions of law, in addition to the general findings made, are stated as follows:

## Finding of Fact.

(1) There was no detention of the vessel due to the act or default of the libelant, which can be made the basis of a demurrage charge.

## Conclusions of Law.

(1) The libelant is entitled to recover the sum of $32,775, with interest from March 9, 1920.

(2) The libelant is entitled to recover costs.